**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar. No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DARREN COBB, Individually and on Behalf of All Others Similarly Situated, | Case No. 24-cv-6696 _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMAND** |
| WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.; and WELLS FARGO CLEARING SERVICES, LLC (d/b/a WELLS FARGO ADVISORS), | |
| Defendants. | |

I.   **INTRODUCTION**

1.   This class action arises out of Wells Fargo's drastic under-payment of interest to its own customers in its cash sweep program.  Wells Fargo underpaid its customers in violation of its fiduciary and contractual duties in order to enrich itself at its customers' expense.  Rather than pay its customers a reasonable rate of interest on their cash as it was required to do, Wells Fargo instead paid miniscule rates to its customers, while it earned hundreds of millions of dollars on that cash due to rising interest rates.

2.   In a typical cash sweep program for a brokerage customer, the brokerage firm moves uninvested cash from a customer's brokerage account into an interest-bearing account that generates returns for the client.  When Wells Fargo sweeps its customers' cash into its cash sweep program, Wells Fargo uses that cash to generate outsized returns for itself, due to the spread between the interest income that Wells Fargo earns on the cash in high interest rate environments, and the amount of interest that it pays its clients.

3.   Wells Fargo is required to act as a fiduciary in the best interests of its clients. That includes a duty to put its customers' interests ahead of its own when recommending and making investments for them.  Wells Fargo explicitly promised to pay its clients with Wells Fargo retirement accounts a "reasonable rate" of interest when Wells Fargo sweeps their cash into its cash sweep program.  In addition, under the law, the agreement between Wells Fargo and its clients carries with it an implied covenant of good faith and fair dealing.  That includes an implied promise that neither party will do anything to frustrate the fruits of customers' bargain with Wells Fargo.

4.   Rather than act as a fiduciary in the best interests of Wells Fargo's account holders, or fulfill its contractual and implied covenant obligations to its customers, Wells Fargo used its customers' funds to enrich itself at the expense of its own clients.

5.   Rising interest rates presented an opportunity for Wells Fargo customers to earn more on their cash sweep account balances.  By improperly keeping the interest rates paid on cash sweep accounts low, Wells Fargo usurped that opportunity for itself, leveraging its own clients' cash for its own benefit and earning near-guaranteed outsize returns year after year.

6.     For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year.  By contrast, during much of 2023, Wells Fargo paid customers with cash sweep accounts (and assets at Wells Fargo of up to $999,999) an interest rate of only 0.15%.  That is *more than 36 times less* than the short-term Treasury Bill rate at the time.  At present, Wells Fargo pays such accountholders only .02% interest on their cash sweep account balances.  That is *more than 234 times less* than the prevailing short-term Treasury Bill yield.

7.     There is nothing "reasonable" or "fair" about those rates, or about Wells Fargo using its clients' cash balances to reap windfall profits at these disproportionate spreads.  In stark contrast, Fidelity—a Wells Fargo competitor—automatically sweeps uninvested cash in its clients' brokerage accounts into a money market fund currently earning approximately 5%.  Wells Fargo's misconduct was a breach of its fiduciary duties, a breach of its contracts with retirement fund account holders, and a breach of the implied covenant of good faith and fair dealing.

8.     Wells Fargo's misconduct related to its cash sweep accounts has come under scrutiny from the U.S. Securities and Exchange Commission ("SEC").  In the fall of 2023, Wells Fargo disclosed that the SEC had launched an investigation into the cash sweep options that Wells Fargo provided to its advisory clients.  Wells Fargo later disclosed on August 1, 2024, that it "is in resolution discussions with the SEC."

9.     Amid the SEC investigation, Wells Fargo announced on July 12, 2024, that it was changing the rates "in wealth and investment management on sweep deposits and advisory brokerage accounts."  Wells Fargo Chief Financial Officer Michael Santomassimo said that this change "better aligns [with] rates paid in money market funds and is expected to reduce net interest income by approximately $350 million this year."  This highlights the massive income that Wells Fargo gains at the expense of customers.

10.    Plaintiff, individually and on behalf of the proposed Class and Subclasses defined herein, brings this class action to remedy the significant financial harm caused by the Defendants' use of the Wells Fargo cash sweep program to enrich Wells Fargo at the cost of its

own clients.

**II.   <u>JURISDICTION AND VENUE</u>**

11.     This Court has subject matter jurisdiction over Plaintiffs' and the Class's claims pursuant to the Class Action Fairness Act, including 28 U.S.C. § 1332(d).   The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiff and other class members are a citizen of States different from the Defendants.

12.     This Court has personal jurisdiction over Defendants because Wells Fargo is headquartered in San Francisco and it conducts substantial business in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b).

**III.   <u>PARTIES</u>**

**A.      Plaintiff**

14.     Plaintiff Darren Cobb is a citizen of Nevada, who maintained a Traditional Individual Retirement Account ("IRA") that was managed by Defendant Wells Fargo Clearing Services, LLC d/b/a Wells Fargo Advisors ("Wells Fargo Advisors").   The cash balances in his account were, at times, swept into Wells Fargo's Bank Deposit Sweep Program (the "Cash Sweep Program").

**B.      Defendants**

15.     Defendant Wells Fargo & Company operates as a diversified financial services company.   It is incorporated in Delaware and has its principal place of business in San Francisco, California, from where it provides banking, insurance, investments, mortgage, leasing, credit cards, and consumer finance services.   Wells Fargo & Company provides these services through its subsidiaries (including Wells Fargo Advisors), and its Wealth and Investment Management segment provides customers with investment management and fiduciary services.

16.     Defendant Wells Fargo Bank, N.A. provides Wells Fargo & Company's personal and commercial banking services.   It is Wells Fargo & Company's wholly-owned, national banking subsidiary with its principal place of business in San Francisco, California.   As of December 31, 2023, Wells Fargo Bank, N.A. had assets of $1.7 trillion, or 90% of Wells Fargo & Company's assets.   As the parent corporation of Wells Fargo Bank, N.A., Wells Fargo &

Company exercises control over the operations of Defendant Wells Fargo Bank, N.A., dictates the policies, procedures, and practices of Wells Fargo Bank, N.A., exercises power and control over the specific activities upon which the claims herein are based, and received the benefits of the wrongful conduct alleged herein.

17.     Defendant Wells Fargo Advisors is a registered broker-dealer and provides brokerage and investment advisory services.  It is a Delaware limited liability company and has its principal place of business in St. Louis, Missouri.  It is a subsidiary of Wells Fargo & Company, which owns 75% or more of Wells Fargo Advisors.  As the owner of Wells Fargo Advisors, Wells Fargo & Company directs the management and policies of Wells Fargo Advisors.

18.     Wells Fargo and Company, Wells Fargo Bank, N.A., and Wells Fargo Advisors, are referred to collectively herein as "Wells Fargo" or "Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     Wells Fargo's Cash Sweep Programs

19.     Net interest income is the difference between how much interest banks earn on loans and investments, and how much they pay out to depositors.  Wells Fargo is motivated to increase its net interest income by depressing the value of the interest that it pays to its customers, while taking advantage of the interest that Wells Fargo itself earns on the higher rates that it receives on the customer cash that is held at Wells Fargo.

20.     Wells Fargo has two different cash sweep programs:  (i) the Expanded Bank Deposit Sweep; and (ii) the Standard Bank Deposit Sweep, for those customers who elect not to participate in the Expanded Bank Deposit Sweep.  Collectively, these are referred to herein as the "Cash Sweep Program."

21.     The Wells Fargo Standard Bank Deposit Sweep sweeps customer cash to banks that are affiliated with Wells Fargo.  The Wells Fargo Expanded Bank Deposit Sweep sweeps customers' cash to banks that are both affiliated and unaffiliated with Wells Fargo.  Regardless of whether the banks are affiliated or unaffiliated with Wells Fargo, the interest rates paid to Wells Fargo customers are determined by the rates charged at the Wells Fargo-affiliated banks.

Wells Fargo Advisors accomplishes this by directing and causing the unaffiliated banks participating in the Expanded Bank Deposit Sweep program to credit interest on their deposits at the same rate as the affiliated banks.  Under this regime, if unaffiliated banks are paying their non-Wells Fargo customers a higher interest rate than the affiliated banks, Wells Fargo Advisors will direct the unaffiliated banks to pay Wells Fargo customers **the lower rate** that is paid by Wells Fargo-affiliated banks.

22.     More specifically, under the Wells Fargo Advisors Cash Sweep Program, uninvested cash balances in customers' accounts are swept into interest-bearing deposit accounts (i.e., the Standard Bank Deposit Sweep or the Expanded Bank Deposit Sweep) or, "if available," stable-value money market mutual funds ("Money Market Funds").  The Money Market Funds at issue are registered with the SEC pursuant to the Investment Company Act of 1940.

23.     Wells Fargo has control and discretion over whether customers are deemed "eligible" for each of the Cash Sweep Program options, and if money market funds are "available," and as a result, which Cash Sweep Program is selected for the customer.   As currently stated in Wells Fargo's Cash Sweep Disclosure Statement:

> **When you open your account**, or you select an ineligible Cash Sweep Option, your Cash Sweep Option **will be** (and any cash balances will be transferred to) the primary Cash Sweep Option for your account type. . . . If you decide to enroll in a new product or service that doesn't offer your current Cash Sweep Option, your new Cash Sweep Option will become the Expanded Bank Deposit Sweep **if you are eligible** (if not, your Cash Sweep Option will be an available Money Market Fund **selected by us**) unless you select a different available Cash Sweep Option.

24.     Similarly, during most of the relevant period, Wells Fargo's Cash Sweep Disclosure Statement stated:

> **When you open your account**, or you select an ineligible Cash Sweep Vehicle, your Cash Sweep Vehicle **will be** (and any cash balances will be transferred to) the Expanded Bank Deposit Sweep **if you are eligible** (if not, your Cash Sweep Vehicle will be (and any cash balances will be transferred to) the Standard Bank Deposit Sweep, **or** an available Money Market Fund **selected by us**).

25.     Wells Fargo controls and has discretion over:  (a) each customer's "eligibility" for

each sweep program vehicle and whether the customer's cash is swept into the Expanded Bank Deposit Sweep, the Standard Bank Deposit Sweep, or Money Market Funds; (b) the characteristics and parameters of each of the available Sweep Cash Program options (Money Market Funds, the Standard Bank Deposit Sweep, and the Expanded Bank Deposit Sweep); (c) if deposited into a Bank Deposit Sweep, the banks in which customers' swept cash is deposited; (d) if invested in Money Market Fund holdings, the specific share class of the Money Market Fund(s) invested in; (e) the rates of interest paid on the Cash Sweep Program deposits (including because they are set by banks affiliated with Wells Fargo and *in consultation with* Wells Fargo Advisors); and (f) the speed at which uninvested cash is swept into sweep vehicles (with Wells Fargo Advisors retaining any interest earned (generally at the Federal Funds rate) on cash balances awaiting disbursement or prior to such balances being swept into a cash sweep vehicle).

26.     Due to Wells Fargo's control and discretion over investors' cash sweep holdings and the returns on such holdings, Wells Fargo owes a fiduciary duty to all of its customers with cash in sweep accounts, which includes a duty to act in their best interests, and to place such best interests ahead of its own self-interest.  Wells Fargo breached that fiduciary duty when it swept client cash into Cash Sweep Program vehicles that paid customers unreasonably low interest rates.

**B.     The SEC Is Investigating Wells Fargo's Cash Sweep Practices**

27.     Wells Fargo is currently under regulatory scrutiny for under-payment of interest rates in cash sweep accounts and related misconduct.  In the fall of 2023, Wells Fargo disclosed that the SEC is investigating it over the cash sweep options provided to its advisory clients.

28.     On July 12, 2024, Wells Fargo disclosed on an earnings call that it was raising the rates in its Cash Sweep Program held by advisory brokerage customers and stated that it anticipates that the change will reduce its earnings by approximately $350 million annually. Wells Fargo described this rate change as "better align[ing] rates with rates paid in money market funds."

29.     On August 1, 2024, Wells Fargo filed a quarterly report in which it disclosed details about the "Advisory Account Cash Sweep Investigation."  Specifically, Wells Fargo

1  disclosed that the SEC "has undertaken an investigation regarding the cash sweep options that

2  the Company provides to investment advisory clients at account opening," and Wells Fargo "is

3  in resolution discussions with the SEC, although there can be no assurance as to the outcome of

4  these discussions."

5     **C.**  **Wells Fargo Advisors' Duties to Its Clients**

6     30.  Wells Fargo Advisors is a registered investment advisor bound by the fiduciary

7  duties imposed on it by the Investment Advisors Act of 1940, including duties of care and

8  loyalty.  This includes a duty for Wells Fargo Advisors to act in the best interests of its clients,

9  and to place the best interests of its customers ahead of its own self-interest.  Similar duties are

10  imposed on Wells Fargo Advisors under principles of broker-dealer law.

11     31.  Wells Fargo Advisors has an investment advisor relationship with the members of

12  the Class.  Wells Fargo Advisors has discretion over the amount of interest secured or paid to

13  Wells Fargo customers.

14     32.  In addition, Wells Fargo Advisors also acts as an agent for its customers.  The

15  Wells Fargo Cash Sweep Disclosure Statement provides that "***Wells Fargo Advisors will act as***

16  ***your agent in establishing*** and maintaining the Bank Deposit Sweep Programs, including

17  making deposits to and withdrawals from the Bank Deposit Sweep Programs."  The disclosures

18  further state that a customer's "***first deposit into the Standard Bank Deposit Sweep or***

19  ***Expanded Bank Deposit Sweep will constitute [the customer's] appointment of Wells Fargo***

20  ***Advisors as [the customer's] agent*** in connection with the Standard Bank Deposit Sweep or

21  Expanded Bank Sweep."

22     **D.**  **Wells Fargo Is Contractually Obligated to Pay a Reasonable Rate of Interest**
23        **on Retirement Accounts**

24     33.  Pursuant to Wells Fargo Bank, N.A. Traditional IRA Custodial Agreement and

25  Disclosures, Wells Fargo IRA customers and Wells Fargo Bank, N.A. agree that "[a]ssets of the

26  IRA may be invested in deposits of Wells Fargo Bank, N.A. (or an affiliate) that bear a

27  reasonable rate of interest."

28     34.  Accordingly, Wells Fargo and Wells Fargo Bank, N.A. have explicitly agreed to

pay a "reasonable rate of interest" on the cash sweep accounts of their retirement account clients.

35. This contractual obligation is in conformity with Internal Revenue Code Section 4975, the provisions of which apply to Wells Fargo's IRA accounts. Specifically, Internal Revenue Code Section 4975 taxes "prohibited transactions," including when an IRA plan sponsor engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975(c).

36. A "disqualified person" includes those "providing services to the plan." 26 U.S.C. § 4975(e)(2)(B). This would include a bank that holds client assets and an advisory firm that determines which bank will hold those assets, including Wells Fargo Bank, N.A. and Wells Fargo Advisors.

37. One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits which bear a ***reasonable interest rate*** in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4). These provisions explicitly target situations where a firm might attempt to benefit from holding its client funds by paying them unreasonably low interest rates, and they are instead required to pay a "reasonable interest rate." Accordingly, under 26 U.S.C. § 4975, Defendants were required to pay a reasonable interest rate to retirement account clients.

38. In the context of accounts governed by 26 U.S.C. § 4975(c), the U.S. Department of Labor defined a "reasonable rate" by considering fair market rates and similar benchmarks, including "short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills)."

39. The U.S. Treasury regulations include a similar requirement where Wells Fargo "invests plan assets in deposits in itself or its affiliates." 26 CFR § 54.5975-6(b)(3)(i). In those circumstances, the parties' agreement "must name" the bank and "state that [the bank] may make investments in deposits which bear ***a reasonable rate of interest*** in itself (or in an affiliate)." *Id.*

40.     In sum, federal law requires that Wells Fargo pay its retirement account clients a "reasonable" interest rate.

**E.      Wells Fargo's Cash Sweep Contracts Include an Implied Covenant of Good Faith and Fair Dealing**

41.     Under New York law—which governs Wells Fargo customers' agreements regarding their cash sweep accounts—all contracts contain an implied covenant of good faith and fair dealing, which encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

42.     This implied covenant includes a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

43.     The current Wells Fargo Cash Sweep Disclosure Statement refers to Defendant Wells Fargo Clearing Services, LLC as "Wells Fargo Advisors"; it refers to banks affiliated with Wells Fargo as the "Affiliated Banks"; and it refers to banks unaffiliated with Wells Fargo as the "Unaffiliated Banks."

44.     The Wells Fargo Cash Sweep Disclosure Statement includes the following terms: "By making the Cash Sweep Program available, Wells Fargo Advisors assumes no obligation to seek or negotiate interest rates in excess of any *reasonable rate of interest* the Affiliated Banks are willing to credit."  While this language is phrased to disclaim responsibility to seek a rate "in excess of" a reasonable rate of interest, the term implicitly commits to pay at least a "reasonable rate" of interest on cash sweep accounts.

45.     Wells Fargo's Cash Sweep Disclosure Statement also includes the following term: "due to the contractual arrangements in place between the Unaffiliated Banks and the Clearing Agent, the rates paid out to clients will be substantially lower than the Federal Funds Effective Rate and *will not increase as quickly as the Federal Funds Effective Rate*."  This term indicates that there is a linkage between the interest rate paid on Wells Fargo cash sweep accounts and the Federal Funds Effective Rate and that, if the Federal Funds Effective Rate rises, so will the interest rate paid out to clients in cash sweep accounts.

46.     Class members' claim under the breach of the implied covenant of good faith and fair dealing is brought solely on behalf of individuals who do not have a contract expressly providing for Wells Fargo's payment of a "reasonable rate" of interest on their sweep account balances (such as in an advisory or IRA agreement).  Such claim is brought on behalf of non-advisory and non-IRA retail customers of Wells Fargo (the "Non-IRA Subclass").  Accordingly, the conduct and resulting injury alleged by the Non-IRA Subclass is not identical to, and such claim is not duplicative of, any asserted contractual claim on behalf of those Subclass members.

**F.     Wells Fargo Breached Its Fiduciary Duties, Contractual Obligations, and the Implied Covenant of Good Faith and Fair Dealing, and Thereby Profited At Its Clients' Expense**

47.     Wells Fargo breached and continues to breach its duties to secure reasonable interest rates for its clients' deposits, its contractual obligations, and the implied covenant of good faith and fair dealing, because the interest it paid on its clients' cash deposits was and is not reasonable.

48.     Below is a chart of the interest rates paid in the Cash Sweep Program, which depended on the amount of assets that clients held in their "households" at Wells Fargo:

| Approximate Dates | Amount of Customer Assets Held at Wells Fargo | Interest Rate |
|---|---|---|
| July 2014 through December 2019 | $0 + | 0.01% |
| December 2019 through January 2021 | $0 - $999,999<br>$1,000,000 - $1,999,999<br>$2,000,000 - $4,999,999<br>$5,000,000 - $9,999,999<br>$10,000,000 - $19,999,999<br>$20,000,000 and up | 0.05%<br>0.06%<br>0.07%<br>0.08%<br>0.09%<br>0.20% |
| January 2021 through June 2022 | $0 - $19,999,999<br>$20,000,000 and up | 0.01%<br>0.01% |
| June 2022 September 2022 | $0 - $19,999,999<br>$20,000,000 and up | 0.02%<br>0.03% |
| September 2022 through February 2023 | $0 - $999,999<br>$1,000,000 - $4,999,999<br>$5,000,000 - $19,999,999<br>$20,000,000 and up | 0.12%<br>0.20%<br>0.30%<br>0.40% |
| February 2023 through April 2024 | $0 - $999,999<br>$1,000,000 - $1,999,999<br>$2,000,000 - $4,999,999 | 0.15%<br>0.50%<br>0.75% |

| | $5,000,000 - $9,999,999 | 0.85% |
| | $10,000,000 - $19,999,999 | 1.25% |
| | $20,000,000 and up | 1.30% |
| April 2024 through September 2024 | $0 - $999,999 | 0.05% |
| | $1,000,000 - $1,999,999 | 0.15% |
| | $2,000,000 - $9,999,999 | 0.25% |
| | $10,000,000 and up | 0.50% |
| September 2024 through present | $0 - $999,999 | 0.02% |
| | $1,000,000 - $4,999,999 | 0.05% |
| | $5,000,000 - $9,999,999 | 0.10% |
| | $10,000,000 - $19,999,999 | 0.15% |
| | $20,000,000 and up | 0.20% |

49.   As set forth above, from as far back as 2014 through the present, for customers with up to $999,999 in assets at Wells Fargo, Wells Fargo paid as little as .01% in interest, and only up to .15%, with that rate falling back to .02% starting in September 2024.

50.   The U.S. Department of Labor has provided the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other clients of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646 (2003).

51.   The Internal Revenue Service similarly defines an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

52.   Under these terms, and any prudent understanding of what a "reasonable" rate of interest is, Wells Fargo did not secure or pay a reasonable rate of interest to its customers, including Plaintiff and Class members.  This is supported by reference to other leading indicators of interest rates being paid during this time period.

**1.   The Federal Funds Rate Benchmark**

53.   The Federal Funds Rate benchmark demonstrates that the interest rate paid to

Wells Fargo cash sweep accountholders was not reasonable.  The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

54.     The Federal Funds Rate increased dramatically in recent years, with an effective rate of 5.33% as of August 28, 2024, for example.  The chart below shows the stark and prolonged increase in the Federal Funds Rate over the past several years.  By contrast, the interest rate paid to Wells Fargo cash sweep account holders has been drastically lower:



## 2.     The Interest Rates on Sovereign Short-Term Debt Benchmark

55.     The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on Wells Fargo cash sweep accounts was not reasonable.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor is paid

the face value.  Treasury Bills are considered safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

56.     The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023, and has remained at that level through August 2024:



**Yield Curve**

During this timeframe, the interest rate Wells Fargo paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 3.     Other Institutions' Sweep Account Interest Rates

57.     Other firms that swept cash to unaffiliated banks paid interest rates that more closely resemble arm's-length negotiations, and therefore more closely reflect the prevailing business and market conditions, than the rates paid by Wells Fargo.

58.     For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than Wells Fargo.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on

cash balances above $5 million).  Wells Fargo, in contrast, paid 0.12% interest (on cash balances up to $1 million), 0.30% interest (on cash balances above $5 million), and 0.40% interest (on cash balances above $20 million) as of September 30, 2022.

59.     Additional examples include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

60.     Similarly, Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million).  In comparison, as of January 20, 2024, Wells Fargo paid only 0.15% (on cash balances up to $1 million), 0.85% (on cash balances above $5 million), and 1.25% (on cash balances above $10 million).

61.     In addition, as of September 2024, the interest rate offered by Vanguard on its sweep program is 4.50% regardless of asset tier.

62.     As these data show, other brokerage and advisory financial institutions that have cash sweep programs pay or secure significantly higher interest rates than Wells Fargo.

**4.     Money Market Rates**

63.     Money market rates are another benchmark for determining a "reasonable rate." As discussed above, on July 12, 2024, Wells Fargo disclosed on an earnings call that it was raising the rates in its Sweep Program held by advisory brokerage customers, and that this rate change was "better align[ing] rates with ***rates paid in money market funds***." [1]  But while Wells Fargo currently pays a .02% interest rate on its lowest tier cash sweep account balances, Wells Fargo affiliate the Allspring Funds pays its customers in its money market fund a 4.76% interest rate.

---

[1] Brokerages Boost Cash Sweep Account Rates to Quiet Outflows, Lawsuits, Financial Advisor (July 24, 2024), *available at* https://www.fa-mag.com/news/brokerages-up-cash-sweep-account-rates-to-quiet-outflows--lawsuits-78914.html; Wells Fargo to Lose $350 Million in Revenue as It Raises Rates on Client Cash, Advisor Hub (July 12, 2024), *available at* https://www.advisorhub.com/wells-fargo-to-lose-350-million-in-revenue-as-it-raises-rates-on-client-cash/.

**5.      The Interest Rate Applicable to Short-term Instruments Such as Repurchase Agreements**

64.      The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present also shows that such rates were significantly higher than Wells Fargo's cash sweep account interest rate.

65.      A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but they usually involve government debt or other debt instruments with steady values.

66.      The overnight repo rate is the interest rate at which different market participants swap Treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep account rates offered by Wells Fargo.

**G.      Wells Fargo Was Unjustly Enriched by Its Misconduct**

67.      Wells Fargo derives significant financial benefits at the direct cost of its clients by keeping the interest rates for its cash sweep accounts artificially low, while it earns higher interest rates on those deposits.

68.      Wells Fargo Advisors and its affiliates benefit financially from cash balances held in the Bank Deposit Sweep Program through the "spread" that its affiliated banks earn on deposits, payments Wells Fargo Advisors receives from affiliated and unaffiliated banks, and incentive compensation management personnel and other employees of Wells Fargo Advisors and its affiliates receive, which are based on several factors including the amount of Bank Deposit Sweep Program assets.

69.      An example of the partial benefit to Wells Fargo derived from the setting of cash

sweep interest rates on cash sweep accounts is reflected by how, when Wells Fargo disclosed on July 12, 2024, that it was changing the rates "in wealth and investment management on sweep deposits and advisory brokerage accounts," Wells Fargo's Chief Financial Officer Michael Santomassimo stated that the change was "expected to reduce net interest income by approximately $350 million this year." Since this change only related to a single year, and only to "advisory" accounts, the overall financial benefit to Wells Fargo over the past several years across its full retail brokerage program was significantly greater.

70. Another example of the benefit to Wells Fargo received from underpaying customers in its cash sweep accounts is reflected by the massive growth of its net interest income from 2021 to present. Between 2021 and 2023, Wells Fargo's net interest income increased ***46%*** from $35.8 billion to $52.4 billion.

## V.   CLASS ACTION ALLEGATIONS

71. Plaintiff re-alleges and incorporates by reference the allegations set forth above. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action individually, and seeks certification of the Class of all retail clients of Wells Fargo who had cash deposits in Wells Fargo's Cash Sweep Program.

72. Plaintiff also seeks certification of a Subclass of Wells Fargo retail clients who held Traditional IRA or Roth IRA accounts with Wells Fargo, but had cash deposits in Wells Fargo's Cash Sweep Program (the "IRA Subclass").

73. Plaintiff also seeks certification of a Subclass of Wells Fargo retail clients who did not have Traditional IRA or Roth IRA accounts with Wells Fargo, but had cash deposits in Wells Fargo's Cash Sweep Program (the "Non-IRA Subclass").

74. Excluded from the Class and Subclasses are Defendants, including Wells Fargo and any of its affiliates, and their officers and directors.

75. The Class members are so numerous that their individual joinder is impracticable. Wells Fargo, including Wells Fargo Advisors, have thousands of customers nationwide, including IRA and non-IRA customers. The Class and Subclasses thus satisfy the numerosity requirement of Federal Rule 23.

76.     Once certified, Class members may be notified of the pendency of this action by customary means pursuant to the requirements of due process, including via mail, media publication, electronic communication, or other appropriate means and methods.

77.     Common questions of law and fact also exist and predominate with respect to the claims of all members of the Class and Subclasses.  These common questions of law and fact include the following:

>       a.      The terms and scope of Wells Fargo's duty to members of the Class, and the extent to which Wells Fargo breached that duty;
>
>       b.      Whether the interest rates paid by Wells Fargo on its Cash Sweep Account program are reasonable;
>
>       c.      Whether Wells Fargo Bank, N.A. breached the contractual terms of its IRA programs with members of the IRA Subclass;
>
>       d.      Whether Wells Fargo breached the implied covenant of good faith and fair dealing with members of the Non-IRA Subclass;
>
>       e.      Whether Wells Fargo was unjustly enriched by its wrongful conduct;
>
>       f.      Whether Wells Fargo committed gross negligence;
>
>       g.      The extent to which Class members, including Subclass members, are entitled to damages or other monetary relief; and
>
>       h.      Whether and to what extent Plaintiff and Class members are entitled to the award of attorneys' fees and the reimbursement of litigation expenses.

78.     Plaintiff's claims are typical of the claims of the other members of the Class and the Subclasses because they were all Wells Fargo retail account holders to whom Wells Fargo paid an unreasonably low interest rate on their cash sweep account holdings.  Plaintiff's claims are typical of the claims of the other members of the Class and the Subclasses because they arise from the same cash sweep program and misconduct by the Defendants.  In addition, the relief sought by members of the Class and Subclasses is common to such members.

79.     Plaintiff will fairly and adequately protect the interests of Class and Subclass

members.   Plaintiff has retained skilled counsel who are experienced in the prosecution of complex class action litigation.

80.   Plaintiff has no interests that are adverse to the interests of the members of the Class or Subclasses.

81.   A class action is a superior vehicle for the present dispute compared to all other available means to redress the claims of Plaintiff and the other members of the Class and Subclasses.  The financial harm that each individual Class member has suffered is small relative to the cost and burden required for each Class member to individually litigate his or her claims against the Defendants.  Absent certification of this case as a class action, it would be virtually impossible for individual Class members to obtain effective redress for the wrongs alleged herein.

82.   Superiority is further satisfied here, where the law of New York will apply to all state law claims under the terms of Wells Fargo's contracts with its customers.

**VI.     PLAINTIFF'S CLAIMS FOR RELIEF**

**COUNT ONE**

**Breach of Fiduciary Duty**

**Brought on behalf of the Class Against All Defendants**

83.   Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

84.   Defendants owed fiduciary duties to the Class due to Defendants' exercise of control and discretion over Plaintiff's and other Class members' financial holdings.

85.   Defendants' duties to Plaintiff and the members of the Class included (i) a duty of care; (ii) a duty of loyalty to their clients; and (iii) a duty to act in the best interest of their clients, including by placing the interests of their clients ahead of their own best interests.

86.   As set forth above, Defendants breached their duties to the clients when they (i) allocated clients' cash into sweep accounts that benefited Wells Fargo's interests above their clients' interests; and (ii) set and paid an unreasonably low rate of interest on clients' cash sweep accounts.

87.     Defendants' past and ongoing breaches of their fiduciary duties to Plaintiff and the Class members damaged Plaintiff and the Class because they failed to earn a reasonable rate of return on their cash balances while the benefit accrued to Wells Fargo.

88.     Accordingly, Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

## COUNT TWO

### Unjust Enrichment

### Brought on behalf of the Class Against All Defendants

89.     Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

90.     Defendants' wrongful conduct caused Plaintiff and the other members of the Class to receive unreasonably low interest payments on their cash sweep deposits, and Defendants derived the benefit of such under-payment in the form of net interest income, fees, and other financial benefits.

91.     As a result, Defendants were unjustly enriched by their misconduct, and Plaintiff and the other members of the Class conferred a benefit upon Defendants because they received significantly greater net interest income than they otherwise would have, but for Defendants' misconduct.

92.     Defendants understood, accepted, and retained the benefits conferred by Plaintiff and the other members of the Class.

93.     It would be inequitable and unjust for Defendants to retain the benefits of their misconduct, including the net interest income they earned at the expense of their own clients.

94.     Plaintiff and the other members of the Class suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the profits unjustly obtained by Defendants, plus prejudgment interest on those amounts.

CLASS ACTION COMPLAINT

**COUNT THREE**

**Breach of Contract**

**Brought on behalf of the IRA Subclass Against All Defendants**

95.     Plaintiff, individually and on behalf of the IRA Subclass, hereby re-alleges the allegations set forth above as if fully set forth herein.

96.     The Wells Fargo agreements for its IRAs offered and provided to members of the IRA Subclass are a valid and binding contract between Wells Fargo (including Wells Fargo Bank, N.A.) and its IRA accountholders.

97.     The governing documents require Wells Fargo Bank, N.A. to pay customers a "reasonable rate of interest" on IRA Subclass members' cash deposits or balances maintained in the IRAs.

98.     Wells Fargo breached the terms of its agreements with Plaintiff and the members of the IRA Subclass because Wells Fargo Bank, N.A. did not pay its customers a "reasonable rate of interest" on their cash deposits.

99.     Plaintiff and the members of the IRA Subclass suffered financial harm from the Defendants' misconduct, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

**COUNT FOUR**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Brought on behalf of the Non-IRA Subclass Against All Defendants**

100.    Plaintiff, individually and on behalf of the Non-IRA Subclass, hereby re-alleges the allegations set forth above as if fully set forth herein.

101.    Wells Fargo retail, non-IRA accountholders entered into a written contract with Wells Fargo—the terms of which are contained in and incorporated into various standardized documents drafted by Wells Fargo, including the Cash Sweep Program Disclosure Statement. These documents were and are, for all purposes relevant hereto, contracts between the retail, non-IRA accountholders and Wells Fargo.

102.    Plaintiff and members of the Non-IRA Subclass paid valuable consideration in

exchange for these contractual rights.

103.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Wells Fargo to deal fairly with the retail, non-IRA accountholders, to fulfill their obligations in good faith, and to not deprive Non-IRA Subclass members of the fruits of their bargain.

104.    By failing to pay the Non-IRA Subclass members a reasonable rate of interest, Wells Fargo breached the implied covenant of good faith and fair dealing inherent in the contracts.   Through the implied covenant of good faith and fair dealing, Wells Fargo was obligated to pay the members of the Non-IRA Subclass a reasonable rate of interest and provide a reasonable default for cash balances that paid clients a reasonable rate of interest on cash balances.   By failing to do so, Wells Fargo violated the reasonable expectations of the members of the Non-IRA Subclass.

105.    The members of the Non-IRA Subclass suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

### COUNT FIVE

#### For Gross Negligence

#### Brought on Behalf of the Class Against All Defendants

106.    Plaintiff, individually and on behalf of the Class, hereby re-alleges the allegations set forth above as if fully set forth herein.

107.    As set forth above, Defendants owed fiduciary duties to Plaintiff and the other members of the Class in the operation of the Wells Fargo Cash Sweep Program.

108.    Defendants breached their duties to Plaintiff and the Class by acting in their own best interest to the detriment to Plaintiff and the Class, which included failing to pay a reasonable rate of interest on customers' Wells Fargo cash sweep account balances.

109.    Defendants' misconduct was grossly negligent because it comprised a reckless disregard for Wells Fargo's clients' best interests, and represented an extreme departure from the ordinary standard of care.

110. Defendants' misconduct directly and proximately caused financial harm to Plaintiff and the other members of the Class. As a result, Plaintiff and other Class members are entitled to damages from the Defendants, plus prejudgment interest thereon.

## VII. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class (including the IRA and Non-IRA Subclasses), demands judgment and relief as follows:

1. For an order certifying the proposed Class and Subclasses, and appointing Plaintiff and Plaintiff's counsel to represent the proposed Class and Subclasses;

2. For an order awarding Plaintiff and Class and Subclass members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

3. For an order awarding Plaintiff and Class and Subclass members restitution, disgorgement, or such other and further relief as the Court deems proper; and

4. For an order awarding Plaintiff and the Class and Subclass reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII. JURY TRIAL DEMAND

Plaintiff, individually and on behalf of the Class (including the IRA and Non-IRA Subclasses), demands a trial by jury on all issues so triable.

Dated: September 24, 2024        Respectfully submitted,

By: */s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar. No. 256898)
**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470
jonathanu@blbglaw.com

Salvatore J. Graziano (*pro hac vice* forthcoming)
John Rizio-Hamilton (*pro hac vice* forthcoming)
Avi Josefson (*pro hac vice* forthcoming)
Adam H. Wierzbowski (*pro hac vice* forthcoming)
Michael D. Blatchley (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
salvatore@blbglaw.com

johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

-and-

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*pro hac vice* forthcoming)
3003 Purchase Street
P.O. Box 529
Purchase, New York 10577
Tel: (212) 879-8100
robert.j.jackson@nyu.edu

*Counsel for Plaintiff and the Proposed Class and*
*Subclasses*

CLASS ACTION COMPLAINT